**15-13830**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

SAVANNAH COLLEGE OF ART AND DESIGN, INC.,

*Plaintiff-Appellant,*

— v. —

SPORTSWEAR, INC., d.b.a. PREP SPORTSWEAR,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

## BRIEF FOR PLAINTIFF-APPELLANT

W. SCOTT CREASMAN
KELLY CASEY MULLALLY
SETH KINCAID TRIMBLE
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
(770) 434-6868

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1 and 26.1-3, Appellant Savannah College of Art and Design, Inc., hereby certifies that the following persons or entities have an interest in the outcome of this case:

Axel, Bradford J.

Creasman, W. Scott

Gardner, Arthur A.

Mullally, Kelly Casey

Prep Sportswear (a "d/b/a" designation)

Ruiter, Leslie C.

Savannah College of Art and Design, Inc.

Sportswear, Inc.

Thrash, Judge Thomas W.

Trimble, Seth K.

Respectfully submitted this 5th day of October, 2015.

*/s/ W. Scott Creasman*
W. Scott Creasman
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
(770) 434-6868
screasman@taylorenglish.com

C-1

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Savannah College of Art and Design, Inc. ("SCAD"), respectfully requests oral argument in this matter pursuant to Federal Rule of Appellate Procedure 34 and Eleventh Circuit Rule 28-1. SCAD's case is based on the application of controlling Eleventh Circuit precedent that the District Court inexplicably failed to acknowledge in resolving the case and that Defendant-Appellee Sportswear, Inc., merely contends "is simply wrong." Although SCAD believes that the application of this well-established precedent is straightforward and conclusively resolves this case, because no meaningful discussion of it by the District Court or by Sportswear has taken place, and because affirmance of the District Court's decision would require the Court to rehear this case *en banc* and overturn that well-established precedent, SCAD believes that the Court will be significantly aided by oral argument in this appeal. Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .............................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ......................................................................... iv

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.. vii

STATEMENT OF THE ISSUES.............................................................................1

STATEMENT OF THE CASE................................................................................2

STANDARD AND SCOPE OF REVIEW ............................................................11

SUMMARY OF THE ARGUMENT ....................................................................11

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................14

I. The District Court Erred in Failing to Apply, or Even Acknowledge, the Law
That Controls the Outcome of This Case........................................................14

A. This Court's Precedent Establishes That SCAD Need Not Hold
Registrations That Specify Apparel to Recover in This Case .................15

B.    The District Court Erred in Instead Applying Case Law Relating to Priority Disputes ........................................................................22

II.    SCAD is Entitled to Summary Judgment ....................................................26

A.    The Lanham Act and GUDTPA ............................................................26

B.    There is No Genuine Issue of Material Fact That SCAD Owns Valid Trademarks ...........................................................................................30

C.    There is No Genuine Issue of Material Fact That a Likelihood of Confusion Exists .................................................................................30

1.    SCAD's Trademarks Are Strong and Distinctive ..............................31

2.    The Similarity of Marks Strongly Favors SCAD ................................33

3.    The Products, Customers, and Advertising, to the Extent Relevant, Are Similar If Not the Same ........................................................................35

4.    Sportswear's Intent Is a Critical Factor in SCAD's Favor ..................36

5.    Sportswear Misunderstands What Constitutes Actionable Confusion under the Lanham Act .......................................................................37

III.  The District Court Erred by Granting in Part Sportswear's Motion to Strike .................................................................................40

CONCLUSION ..............................................................................45

CERTIFICATE OF COMPLIANCE ................................................CC-1

CERTIFICATE OF SERVICE .........................................................CS-1

iii

# TABLE OF CITATIONS

## Cases

*Ackerman Sec. Sys., Inc. v. Design Sec. Sys., Inc.,* 201 Ga. App. 805, 412 S.E.2d 588 (1991) ........................................................................................29

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) ....................37

*B&G Enters., Ltd. v. United States*, 220 F.3d 1318 (11th Cir. 2000).....................11

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,* 550 F.3d 465 (5th Cir. 2008).........................................................34

*Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) .................................15

*\*Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir. 1975)............................................................................... passim

*Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC,* 605 F.3d 931 (11th Cir. 2010)..................................................................................29

*Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358 (11th Cir. 2002).........................11

*Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir. 1984) ........................... 28, 31

*Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999)................................44

*Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.2d 1313 (11th Cir. 2011) ................................................................. passim

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd*., 604 F.2d 200 (2d Cir. 1979) .............................................................................................20

*Dieter v. B & H Indus., Inc.*, 880 F.2d 322 (11th Cir. 1989)...................... 27, 31, 32

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc.,* 756 F.2d 1525 (11th Cir. 1985) ..........................................................................................33

*Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176 (11th Cir. 1985)...................32

iv

*Frehling Enters., Inc. v. Int'l Select Group, Inc.*,
  192 F.3d 1330 (11th Cir. 1999) ..........................................................................32

*Gameologist Group, LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141
  (S.D.N.Y. 2011) ..................................................................................................24

*Investacorp, Inc. v. Arabian Inv. Banking Corp.*,
  931 F.2d 1519 (11th Cir. 1991) ..........................................................................31

*Kason Indus. v. Component Hardware Group*,
  120 F.3d 1199 (11th Cir. 1997) ......................................................................... 29

*Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*,
  496 F.3d 1231 (11th Cir. 2007) ..........................................................................29

*Pepsico, Inc. v. #1 Wholesale, L.L.C.*,
  2007 U.S. Dist. LEXIS 53768  (N.D. Ga. 2007) .................................................20

*Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001).......23

*Rolls Royce Motors Ltd. v. A & A Fiberglass, Inc.*,
  428 F. Supp. 689 (N.D. Ga. 1976) ....................................................................38

*Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502 (11th Cir. 1985) ..............28

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*,
  675 F.2d 1160 (11th Cir. 1982) ..........................................................................32

*St. Charles Foods, Inc. v. America's Favorite Chicken Co.*,
  198 F.3d 815 (11th Cir. 1999) ............................................................................11

*SunAmerica Corp. v. Sun Life Assurance Co.*, 77 F.3d 1325 (11th Cir. 1996).......40

*Tally-Ho, Inc. v. Coast Cmty. College Dist.*, 889 F.2d 1018 (11th Cir. 1989)........23

*Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010)………………………………….4

*Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171 (11th Cir. 2013) ................43

*Thornton v. E.I. Du Pont de Numours & Co.*, 22 F.3d 284 (11th Cir. 1994)..........11

v

*United States v. Oakley*, 744 F.2d 1553 (11th Cir. 1984)........................................40

*United States v. Torkington*, 812 F.2d 1347 (11th Cir. 1987) ................................39

*\*University of Georgia Athletic Ass'n v. Laite,*
    756 F.2d 1535 (11th Cir. 1985) .................................................. passim

*Welding Servs., Inc. v. Forman*, 509 F.3d 1351 (11th Cir. 2007) ..........................31

*Whatley v. CNA Ins. Co.*, 189 F.3d 1310 (11th Cir. 1999)......................................11

**Statutes**

15 U.S.C. § 1125....................................................... 2, 15, 17, 18, 27, 28

15 U.S.C. § 1114.................................................. 2, 15, 17, 27, 28, 29, 39

O.C.G.A. § 10-1-370 to -75 .....................................................................2

O.C.G.A. § 10-1-372.............................................................................29

**Rules**

Fed. R. Civ. P. 26 ........................................................................... 41, 42

Fed. R. Civ. P. 34 .................................................................................41

Fed. R. Civ. P. 37 .................................................................................41

**Other Authorities**

R. Schechter & J. Thomas, *Intellectual Property: The Law of Copyrights, Patents
    and Trademarks* 638 (2003)................................................................39

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiff-Appellant Savannah College of Art and Design, Inc., initiated this action in the United States District Court for the Northern District of Georgia, which had jurisdiction pursuant to 15 U.S.C. §§ 1114, 1116, 1121, and 1125 and 28 U.S.C. §§ 1331, 1338, and 1367.

The District Court entered Judgment disposing of all claims on August 3, 2015, and the Notice of Appeal was timely filed on August 26, 2015.

The United States Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the District Court err in granting the Defendant-Appellee's motion for summary judgment and denying the Plaintiff-Appellant's motion for summary judgment, on the basis that the Plaintiff-Appellant did not establish the date of first sale of *apparel* bearing its trademarks, a requirement in direct contravention of the law of this Circuit that controls this case—law that the lower court failed to even acknowledge and that the Defendant-Appellee cannot refute—providing that a trademark holder's rights with respect to *services* are alone sufficient to sustain a cause of action prohibiting the sale of *products* bearing those trademarks under the Lanham Act, regardless of when the plaintiff has first sold those products or whether it has even ever done so at all?

2.      Did the District Court err in excluding an article available on a website cited by the Plaintiff-Appellant when it was not a document or thing in the Plaintiff-Appellant's possession, custody, or control during discovery, it did not contradict any position that the Plaintiff-Appellant had previously taken or evidence that the Plaintiff-Appellant had previously produced, and the excluded evidence, under the law that the lower court applied to the Plaintiff-Appellant's claims (albeit erroneously), would have resulted in a different outcome on the merits of this case?

## STATEMENT OF THE CASE

### I.     Nature of the Case, Course of Proceedings, and Disposition Below

Plaintiff-Appellant Savannah College of Art and Design, Inc. ("SCAD"),
filed this action against Defendant-Appellee Sportswear, Inc., d/b/a Prep
Sportswear ("Sportswear") in July 2014.   SCAD's lawsuit seeks recovery of
damages and equitable relief pursuant to Section 32 of the Lanham Act (15 U.S.C.
§ 1114) for trademark infringement, Section 43 of the Lanham Act (15 U.S.C.
§ 1125) for unfair competition and false designation of origin, and the Georgia
Uniform Deceptive Trade Practices Act ("GUDTPA") (O.C.G.A. § 10-1-370 -75)
for unfair competition and trademark infringement resulting from Sportswear's
unauthorized use of SCAD's federally registered trademarks.  (Docs.[1] 1, 13, 24).

Following discovery, SCAD and Sportswear filed cross-motions for
summary judgment on SCAD's claims.  After the parties filed their reply briefs in
support of their respective motions for summary judgment, Sportswear filed a
motion to strike (Doc. 50), challenging SCAD's citation of an article posted on a
website (Doc. 49, p.[2] 2 n.1) and portions of a declaration (Doc. 49-2) that had been
cited by SCAD in its reply brief in support of its motion for summary judgment

---

[1] "Doc." numbers herein correspond to the tab number in the Appellant's Appendix
and to the document number assigned on the District Court's docket sheet.
[2] Citations to page numbers correspond to the page number of the document
reflected in the District Court docket entries, at the top of the document.

(Doc. 49, p. 2). In an Opinion and Order filed on August 3, 2015, the District Court granted Sportswear's motion for summary judgment and denied SCAD's motion for summary judgment. (Doc. 53). The court also granted Sportswear's motion to strike with respect to the article and denied the remainder as moot. (*Id.*)

The District Court entered its Judgment resolving all claims in the case on August 3, 2015 (Doc. 54), and SCAD timely filed its Notice of Appeal on August 26, 2015 (Doc. 58). On August 17, 2015, Sportswear filed a motion for attorney's fees, which the District Court stayed pending this appeal. (Doc. 70).

## II. Statement of Facts

### A. SCAD and SCAD's Trademarks

SCAD is a non-profit collegiate educational institution founded in Savannah, Georgia, in 1978. SCAD has grown over the years to now also include campuses in Atlanta, Georgia; Hong Kong; and Lacoste, France. (Doc. 47-3, p. 1-2). SCAD's educational program has a focus on a variety of artistic pursuits including traditional arts such as painting and sculpture but also offers courses of study and degrees involving architecture, art history, industrial design, fashion, photography, film and television, furniture, graphic and industrial design, writing, and arts administration among others. In addition to these academic endeavors, SCAD fields athletic teams from its Atlanta and Savannah campuses that compete in a variety of intercollegiate sports, including cross country, equestrian, golf, lacrosse,

3

tennis, track and field, soccer, swimming.  (Doc. 47-3, p. 4; 40-3, p. 2).

SCAD holds four federal trademark registrations for its logos and symbols:

Registration No. 2,686,644, for SCAD, a word mark that has achieved incontestable status (Doc. 1-1; Doc. 49-3, pp. 10-14);

Registration No. 2,918,888, for SAVANNAH COLLEGE OF ART AND DESIGN, a word mark that has achieved incontestable status (Doc. 1-2; Doc. 49-3, pp. 24-28);

Registration No. 3,118,809, for SAVANNAH COLLEGE OF ART AND DESIGN FOUNDED 1978, a word/design mark that has achieved incontestable status (Doc. 1-3; Doc. 49-3, pp. 44-45); and

Registration No. 3,751,493, for SAVANNAH COLLEGE OF ART AND DESIGN BEES,



a word/design mark (Doc. 1-4).

All four marks are registered for educational services.[3]  Specifically, the first three

registrations list "educational services, namely providing instruction and training at

the undergraduate, graduate and post-graduate levels," and the fourth registration

---

[3] Service mark infringement and trademark infringement are governed by the same standards, and the terms "service mark" and "trademark" are typically used interchangeably.  *See, e.g.*, *Tana v. Dantanna's*, 611 F.3d 767, 772 n.3 (11th Cir. 2010) ("The analysis is the same for service mark and trademark infringement."); *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1334 n.1 (11th Cir. 1999) ("The infringement analysis is the same under both standards and courts thus treat the two terms as interchangeable in adjudicating infringement claims.").

4

lists "educational services, namely, providing courses of instruction at the college level, and distributing course materials in connection therewith; arranging and conducting a sports and athletic program in conjunction with educational activities as a college[.]" (Doc. 1-1; Doc. 1-2; Doc. 1-3; Doc. 1-4; Doc. 47-3, pp. 6-7). They are not registered for apparel.

SCAD has used the SCAD, SAVANNAH COLLEGE OF ART AND DESIGN, and SAVANNAH COLLEGE OF ART AND DESIGN FOUNDED 1978 trademarks since 1979. (Doc. 47-3, p. 4; Doc. 40-3, p. 2; Doc. 1-1; Doc. 1-2; Doc. 1-3). SCAD has used SAVANNAH COLLEGE OF ART AND DESIGN BEES since 2001. (Doc. 40-3, p. 2). Variations of the illustrated bee (known as "Art the Bee") portion of the mark were used as early as 1996. (Doc. 40-3, p. 2; Doc. 47-3, pp. 5-6).

As part of providing educational services for its students, SCAD uses these trademarks to market, advertise, and promote its programs and services, including with SCAD's athletic teams. (*See, e.g.*, Doc. 40-5, pp. 5-15). SCAD has expended considerable resources since 1979 in protecting its marks to create and maintain its reputation and good will. In connection with those efforts, SCAD has made significant monetary expenditures and has widely publicized its marks through means such as websites, email newsletters, magazines, journals, newspapers, and trade publications. (*See, e.g.*, Doc. 39-22, p. 9; Doc. 46-1, pp. 9-10). For example,

SCAD spent over $1.6 million promoting and advertising its educational services using its trademarks from 2001 to 2004.  (Doc. 39-22, p. 9).

In carefully controlling the use of its trademarks, SCAD exclusively licenses Follett Education Group, Inc., ("Follett") to operate SCAD's on-campus bookstores at the SCAD Atlanta and SCAD Savannah campuses, and to operate SCAD on-line stores.  (Doc. 40-3, p. 4; Doc. 47-3, p. 10).  Under this arrangement, SCAD reviews and approves or rejects all products with SCAD's name, trademark, and logo that Follett will sell.  (Doc. 46-2, p. 3).  Follett only sells products containing the SCAD trademarks that have been approved by SCAD.  (Doc. 40-3, p. 4; Doc. 49-1, p. 12).  SCAD students design many of the shirts and other items that use the SCAD trademarks.  (Doc. 40-3, p. 3-4).

### B.    Sportswear's Misappropriation of SCAD's Trademarks

Sportswear markets and sells products bearing the insignia of a variety of schools and other organizations in an attempt to reach consumers with an affinity for those institutions.  (Doc. 46-1, pp. 21-22).  Sportswear buys blank shirts, other apparel, and merchandise from third parties (such as Nike or Fruit of the Loom) and then applies the name, mascots, and/or logos (*i.e.*, the trademarks) of universities, schools, teams, and various other entities.  Sportswear provides a website that is accessible at www.prepsportswear.com.  (Doc. 49-1, p. 20).

Effectively, Sportswear uses the trademarks of smaller schools without

permission, license, or payment, while it licenses (and pays to use) the trademarks of larger schools with more visible athletic programs or does not offer merchandise bearing the trademarks of such larger schools.  For example, Sportswear offers merchandise with the Baylor University, Iowa State, and Kansas State trademarks under license (Doc. 41-1, pp. 140-43), and does not offer merchandise with the trademarks of the University of Georgia or the Georgia Institute of Technology, which do not have licenses (Doc. 41-1, pp. 143-44, 146).  In the case smaller schools, like SCAD, Sportswear uses the school's trademarks without a license.

Although Sportswear's CEO (who is also its CFO and COO) claimed to have no knowledge of SCAD until receiving a cease and desist letter from SCAD's attorneys in 2014, Sportswear's website included an on-line SCAD store that featured SCAD products since, according to Sportswear, 2009.[4]  (Doc. 41-1, pp. 13, 53; Doc. 47-3, pp. 11-12; Doc. 49-1, pp. 19-20).  Sportswear's website database listing for SCAD includes information such as SCAD's school colors and bees being SCAD's mascot.  (Doc. 41-3; 47-3, p. 13).  Sportswear's SCAD website offered for sale a large selection of apparel and related products bearing Savannah College of Art and Design, SCAD, SCAD Bees, and Art the Bee.  (Doc. 47-3, p. 14; 46-1, pp. 22-23).  For each SCAD item featured, that website

---

[4] Sportswear stopped offering for sale items displaying SCAD's trademarks only after the filing of this lawsuit (Doc. 46-1, p. 26), and it has made clear its desire to resume selling SCAD items in the future.

7

displayed a banner reading, "Savannah College of Art and Design Bees Apparel Store." (*See, e.g.*, Doc. 40-10, pp. 12-14). Sportswear exactly duplicates the marks SCAD and SAVANNAH COLLEGE OF ART AND DESIGN. (*See, e.g.*, Doc. 47-3, p. 14; Doc. 40-4, pp. 4, 15, 18, 26, 50, 62). While it does not use the exact entire circular bee design logo found in the SAVANNAH COLLEGE OF ART AND DESIGN BEES mark, Sportswear uses an exact duplication of Art the Bee, and does so in conjunction with other SCAD marks (such as "SCAD Bees" with the bee design or SCAD with the bee design). (*See, e.g.*, Doc. 40-10, p. 5). Sportswear's "Savannah College of Art and Design Bees Apparel Store" offered many products that were the same or substantially similar to the apparel products offered by SCAD and used in connection with SCAD's programs and activities. (*See, e.g.*, Doc. 40-4, pp. 5-6, 9-14; Doc. 40-5, pp. 5-15). Sportswear, however, has never had permission from SCAD to offer or sell anything with SCAD's trademarks. (Doc. 47-3, pp. 10-11, 15).

In 2014, SCAD became aware that Sportswear was selling apparel and other products with SCAD's trademarks when the parent of a SCAD student-athlete forwarded to a SCAD coach a link to Sportswear's website. (Doc. 47-3, p. 11). In seeing Sportswear's website, even SCAD employees had to inquire as to whether Sportswear's sale of SCAD merchandise was allowed or authorized. (Doc. 45-11). After Sportswear refused to discontinue selling items bearing SCAD's trademarks,

8

SCAD filed the instant lawsuit.

### C.    Sportswear's Motion to Strike

SCAD did not base its case on the date on which it first began selling apparel bearing its trademarks. Instead, as explained in Part I.A, *infra*, SCAD's case is predicated on longstanding authority of this Court establishing that SCAD need not have a trademark registration that specifies apparel, or even sell apparel at all, in order to prohibit Sportswear's unauthorized sale of apparel products with SCAD's trademarks. SCAD admits that it did not submit evidence of the first use of its trademarks on apparel. In response to Sportswear's opposition to SCAD's motion for summary judgment, in which Sportswear alleged that SCAD could have begun selling clothes bearing its trademarks in 2015 "well after Prep Sportswear began selling in 2009" (Doc. 47, p. 20), however, SCAD cited a news article posted on a publicly available website demonstrating that SCAD had offered for sale apparel bearing its trademarks prior to 2009, "Sports merchandising lucrative," January 27, 2008, *available at* http://savannahnow.com/sports/2008-01-26/sports-merchandising-lucrative (Doc. 49, p. 2 n.1),[5] which states, among other things, "Both SCAD and SSU sell merchandise at their on-campus bookstores.

---

[5]    At the time SCAD filed its brief, the article was available at http://dining.savannahnow.com/sports/2008-01-26/sports-merchandising-lucrative, (Doc. 51-1, p. 3; *see also* https://web.archive.org/web/20141028003655/http://dining.savannahnow.com/sports/2008-01-26/sports-merchandising-lucrative), but it has now been moved to the above-cited location.

They also sell items online through www.efollett.com." The article had been located by one of SCAD's attorneys after the close of discovery and after receiving Sportswear's brief in opposition to SCAD's motion for summary judgment, while preparing SCAD's summary judgment reply brief. (Doc. 51-1, p. 3). SCAD also provided the declaration of Hannah Flower, SCAD's Associate Vice President for Academic Support and Legal Affairs. (Doc. 49-2, pp. 2-3; Doc. 49, p. 2). The Flower declaration responded to Sportswear's Statement of Additional Material Facts (Doc. 49-1, pp. 9-11) submitted with Sportswear's opposition to SCAD's motion for summary judgment. The declaration updated information already submitted during the summary judgment proceedings regarding financial expenditures and modes of advertising utilized by SCAD in promoting its educational services. (Doc. 46-1, pp. 9-10).

Sportswear filed a "motion to strike" (which the District Court construed as a motion to exclude (Doc. 53, p. 6)) both the article and the Flower declaration (Doc. 50). Although the evidence offered by SCAD related to *use before 2009* (in the case of the article) and use of SCAD's marks *in connection with promoting SCAD and its services and programs* (in the case of the Flower declaration), Sportswear argued that SCAD had failed to properly respond to a variety of discovery requests directed to *the first use* of SCAD's trademarks *in connection with the sale of apparel* (Doc. 50-1, p. 3). In resolving the parties' summary

judgment motions, the District Court granted Sportswear's motion to strike with respect to the article and denied the rest of the motion as moot.  (Doc. 53, pp. 6-8).

## STANDARD AND SCOPE OF REVIEW

This Court reviews the grant or denial of summary judgment *de novo*, without deference to the district court's determination.  *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1322 (11th Cir. 2000); *Thornton v. E.I. Du Pont de Numours & Co.*, 22 F.3d 284, 288 (11th Cir. 1994).  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).  The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

This Court reviews a district court's ruling on a motion to exclude evidence for an abuse of discretion.  *Chrysler Int'l Corp. v. Chemaly*, 280 F.3d 1358, 1362-63 (11th Cir. 2002).

## SUMMARY OF THE ARGUMENT

The District Court erred in analyzing this case as if Sportswear and SCAD were competing companies that had chosen similar trademarks for the same or a similar product.  Here, Sportswear purposefully uses SCAD's name and logo on

apparel to refer to SCAD in an effort to appeal to consumers who support or are interested in SCAD.   Indeed, the value in Sportswear's products derives solely from the unlawful association it creates with SCAD.  As such, this case is directly controlled by two decisions of this Court presenting nearly identical facts.

Specifically, this Court's decisions in *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing, Inc.*, and *University of Georgia Athletic Ass'n v. Laite* flatly reject Sportswear's defense in this case—that because SCAD has not registered its trademarks with respect to apparel or relied upon evidence of prior use with respect to apparel (creating common law rights), SCAD cannot recover.  In *Boston Professional Hockey* and *University of Georgia*, the plaintiffs held service marks, just as SCAD does here, and successfully obtained relief with respect to unauthorized products like Sportswear's.  Interpreting and applying the Lanham Act, both Courts held that a trademark holder is not restricted only to areas of its core services or to the subject of its registrations in its rights to prevent others from using its trademarks in a manner that is likely to cause confusion.  The District Court's requirement that SCAD establish use of its trademarks on apparel before Sportswear's use directly contradicts those holdings.  The lower court's decision is accordingly erroneous as a matter of law and should be reversed.

Rather than apply the two critical precedents that control the outcome of this case, the District Court cited an opinion of this Court setting forth a rule relating to

12

priority disputes—a different type of trademark issue where two parties have adopted similar names or logos and seek to use those names or logos to designate the source of their respective goods and services, not at issue here—and an out-of-circuit district court decision also involving facts and rules not applicable to the present case.  The District Court's actions in doing so are particularly puzzling, because Sportswear's response to the foregoing precedent relied upon by SCAD has only been to argue that it "is simply wrong."  Despite Sportswear's complete failure to distinguish this adverse precedent or to raise a good-faith argument for a change in the law, the District Court inexplicably failed to even address the *Boston Professional Hockey* and *University of Georgia* cases.  Thus, it is unclear why the lower court did not apply the binding law of this Circuit, but its failure to do so constitutes reversible error.

That error alone warrants reversal of the District Court's decisions to grant Sportswear's motion for summary judgment and to deny SCAD's motion for summary judgment.  Should this Court conclude otherwise, however, the District Court also erred in excluding a newspaper article freely available on a website relied upon by SCAD in responding to arguments made by Sportswear in Sportswear's brief in opposition to SCAD's motion for summary judgment.  The article was not a document or thing in SCAD's possession, custody, or control during discovery, and SCAD accordingly was not required to produce it.  This

13

evidence, at a minimum, creates a genuine issue of material fact and the District Court should not have excluded it.  In doing so, the lower court applied incorrect legal standards and substantially prejudiced SCAD, thus abusing its discretion. Should this Court remand the case for further proceedings regarding SCAD's entitlement to relief, SCAD should be permitted to rely on the excluded evidence in support of its case.

### ARGUMENT AND CITATIONS OF AUTHORITY

**I.     The District Court Erred in Failing to Apply, or Even Acknowledge, the Law That Controls the Outcome of This Case**

The District Court based its ruling against SCAD on the fact that SCAD's trademarks are not registered with respect to apparel.  (Doc. 53, pp. 5-6).  The court reasoned that because SCAD's registrations are directed to educational services, SCAD must show "that it used the marks in commerce prior to the Defendant's use."  (Doc. 53, p. 6).  Although SCAD has ample evidence of such prior use of its marks (*see, e.g.*, Doc. 47-3, pp. 4-6; Doc. 40-3, p. 2; Doc. 1-1; Doc. 1-2; Doc. 1-3), the District Court went on to specify that SCAD needed to prove when it "first used its marks *on apparel*" (Doc. 53, p. 6 (emphasis added)). Similarly, Sportswear argued below that because SCAD has not registered its trademarks with respect to apparel, SCAD cannot control how its trademarks are used on apparel by others.  (*See, e.g.*, Doc. 47, pp. 6, 11-13).  As discussed below,

14

those positions of both the District Court and Sportswear are fundamentally flawed and contrary to the applicable law of this Circuit.

### A.    This Court's Precedent Establishes That SCAD Need Not Hold Registrations That Specify Apparel to Recover in This Case

This case is controlled by two Eleventh Circuit decisions dealing with nearly identical circumstances: *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004 (5th Cir. 1975)[6], and *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535 (11th Cir. 1985).  In the *Boston Professional Hockey* case, the National Hockey League ("NHL") and thirteen of its member hockey teams sued to prevent the defendant from selling embroidered emblems (*e.g.*, patches) displaying their trademarks.  Twelve of the hockey teams held federal registrations for their team symbols as service marks, just as SCAD does.  Specifically, the marks were registered "for ice hockey entertainment services," and, also like SCAD, the plaintiffs sought relief pursuant to 15 U.S.C. §§ 1114 and 1125.[7]  510 F.2d at 1008.  Like SCAD, the teams had no registrations directed to apparel or other products.  *Id*. at 1009.  The NHL clubs licensed a third party to sell apparel bearing their team logos, as SCAD does with Follett.  *Id.*  The

---

[6] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[7] One team (Toronto), did not hold a federal registration, and thus relied only on Section 43 of the Lanham Act (15 U.S.C. § 1125).  510 F.2d at 1008.

15

defendant sold competing, unauthorized apparel, as Sportswear does. *Id.* Specifically, as the Court explained, "Defendant deliberately reproduced plaintiff's marks on embroidered emblems and intended the consuming public to recognize the emblems as the symbols of the various hockey teams and to purchase them as such," *id.*, again just as Sportswear does here. As in the instant case, the opposing parties in *Boston Professional Hockey* did not compete in their core businesses.[8]

The Court held for the plaintiffs, reasoning, "[t]he conclusion is inescapable that, without the plaintiffs' marks, defendant would not have a market for his particular product among ice hockey fans desiring to purchase emblems embroidered with the symbols of their favorite teams." *Id.* at 1011. As in *Boston Professional Hockey*, Sportswear unabashedly sells SCAD apparel because it contains SCAD's names and emblems—SCAD's trademarks—to reach consumers with an affinity for the school. (*See, e.g.*, Doc. 46-1, pp. 21-22). Indeed, as the Court reasoned, "the major commercial value of the emblems is derived from the efforts of the plaintiffs." *Id.* The Court further reasoned that the type of activity in which the defendant was engaged "is an accepted use of such team symbols in

---

[8] The case is arguably different in that the defendant in *Boston Professional Hockey* was only selling the plaintiffs' trademarks themselves (in the form of emblems that could be attached to other goods) rather than as already attached to other goods or services, an aspect of the case that the Court noted was "a difficulty." *Id.* at 1010. As SCAD's suit does not even present that issue, this difference does not present a basis for distinguishing *Boston Professional Hockey* and instead only makes its applicability here even more straightforward.

16

connection with the type of activity in which the business of professional sports is engaged." *Id.* In other words, the public would expect the plaintiffs to sell items such as those at issue, in connection with providing ice hockey entertainment services, "through sporting goods stores for informal use by the public in connection with sports activities and to show public allegiance to or identification with the teams themselves." *Id.* Thus, the public would be confused, and such confusion was sufficient to support the plaintiff's claims, even if the public was not confused as to the *source of manufacture* of the emblem. *Id.* at 1012. The Court applied its reasoning "with equal force" to both the section 1114 and section 1125 claims, notably reversing the district court's adverse ruling on the Toronto team's section 1125 claims. *Id.* at 1012-13.

The *University of Georgia* decision is perhaps even more compelling. That case involved state[9] trademark registrations owned by the University of Georgia Athletic Association, Inc. ("UGAA"), incorporating the word "bulldog" or portraying an English bulldog, including one mark depicting an English bulldog wearing a sweater with the letter "G" on it, none involving beer or beverages of any kind. 756 F.2d at 1536. The defendant sold "Battlin' Bulldog Beer" in red and black cans with an English bulldog in a red sweater with the letter "G" on it.

---

[9] UGAA had applied for, but did not have federal registrations during the litigation. 756 F.2d at 1537 n.2.

Significantly, UGAA's state registrations were directed to "services related to sports activities," *id.*, similar to SCAD's marks directed to educational services in the instant case.  Regarding priority of use, the Court noted that it was undisputed that UGAA used the marks at issue long before the defendant's use began, *id.* at 1542 n.15, as with SCAD and Sportswear in this case.  Like SCAD, UGAA sought relief pursuant to 15 U.S.C. § 1125.  *Id.* at 1538-59.

Despite the plaintiff not competing in any way with the defendant's product—the University did not sell beer and thus had no common law trademark rights covering beer, much less have any trademark registrations for beer—the Court on appeal upheld the grant of a permanent injunction prohibiting the defendant's actions based on the plaintiff's rights as to sports activity services alone.  *See id.* at 1537-38.  Among other things, the Court rejected the argument, like Sportswear's argument in this case (*see, e.g.*, Doc. 47, p. 28), that the defendant's use of the plaintiff's trademarks was not infringing because the defendant's use was meant to show allegiance to the school and not to indicate the source of the goods.  *Id.* at 1547.  As the Court explained, "most consumers who purchase products containing the name or emblem of their favorite school or sports team would prefer an officially sponsored or licensed product to an identical non-licensed product."  *Id.*

18

In discussing the types of confusion actionable under the Lanham Act[10] to support its holding, the Court reaffirmed that "'confusion' need not relate to the origin of the challenged product. Rather 'confusion' may relate to the public's knowledge that the trademark, which is the 'triggering mechanism' for the sale of the product, originates with the plaintiff." *Id.* at 1546 (citing *Boston Prof'l Hockey*, 510 F.2d at 1012). The Court flatly rejected the defendant's argument, the same as Sportswear's argument here (*see, e.g.*, Doc. 46, p. 6), that actionable confusion would require a likelihood that consumers would be confused as to whether the plaintiff was the source of the beer, as too narrow. *Id* at 1546. Indeed, the Court deemed the *University of Georgia* defendant's argument that "no one actually believes that the University of Georgia has gone into the brewing business. . . irrelevant to the issues in this case." *Id*. Instead, the public's belief that the trademark holder sponsored or otherwise approved the use of the trademark itself is sufficient to support a claim under the Lanham Act. The Court

---

[10] The Court's statutory interpretation of what constitutes actionable confusion under the Lanham Act occurred within the context of applying the likelihood of confusion factors, namely the "actual confusion" factor, *id.* at 1546, as the likelihood of confusion analysis had been the basis for the district court's decision in *University of Georgia, id.* at 1537, 1544. Because the Court's holding with respect to the scope of the Lanham Act alone makes evident the reversible error in the instant case and because the lower court here never applied the likelihood of confusion factors, SCAD addresses the issue of what type of rights a plaintiff must possess to recover under the Lanham Act first and separately. The rest of the *University of Georgia* Court's likelihood of confusion analysis, however, also supports SCAD's position and is discussed in Part II.C, *infra*.

19

explained, "the confusion stems not from the defendant's unfair competition with the plaintiff's *products*, but from the defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark." 756 F.2d at 1547. Further, the Court quoted with approval *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd*., 604 F.2d 200 (2d Cir. 1979), 756 F.2d at 1547 n.29, where the Second Circuit emphasized that "the trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.'" *Dallas Cowboys Cheerleaders*, 604 F.2d at 205 (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976); s*ee also Pepsico, Inc. v. #1 Wholesale, L.L.C.*, 2007 U.S. Dist. LEXIS 53768 *9-11 (N.D. Ga. 2007) (citing, *inter alia*, *University of Georgia* and noting likelihood of confusion by those who encounter the product at issue (a safe that looked like a can of Pepsi® cola) post-sale, even though the plaintiff did not compete with the defendant in producing its own authorized versions of the product).

Importantly, this confusion is actionable *regardless of any earlier sale of the product at issue by the trademark holder*. The University of Georgia's right to recover was not based on its use of the trademark in connection with the sale of a competing beer, or on it holding a trademark registration directed to the sale beer—neither of those facts existed in the case. The Court did not require the

plaintiff to establish a first date of sale of the product at issue, contrary to the District Court's actions in the instant case. Indeed, *University of Georgia* makes clear that even if SCAD sold no apparel at all with its trademarks, Sportswear would not have the right to sell apparel bearing SCAD's trademarks without SCAD's permission.[11] The first use of SCAD's trademarks on apparel is entirely irrelevant to Sportswear's lack of rights to sell any merchandise bearing SCAD's trademarks. The District Court's requirement that SCAD establish use of its trademarks on apparel before Sportswear's use is accordingly erroneous as a matter of law and should be reversed. As Eleventh Circuit law establishes, a trademark holder is not restricted only to areas of its core services or the subject of its registrations in its rights to prevent others from using its trademarks.

Neither Sportswear nor the District Court's decision provide any basis for distinguishing the foregoing body of law. Instead, Sportswear's response has been to assert that this Court "is simply wrong." (Doc. 48, p. 16). Apparently conceding that *Boston Professional Hockey* and *University of Georgia* are on point, Sportswear has attempted to imply, without support, that *Boston Professional Hockey* had been "unofficially" overturned (*see* Doc. 47, p. 28 (criticizing *Boston Professional Hockey* and referring to it as "not officially

---

[11] The likelihood of confusion, and therefore the case for liability, is even greater in the instant case, because SCAD sells apparel with its trademarks. (*See, e.g.,* Doc. 40-4, pp. 10-14).

21

overturned")), and to suggest that the court below instead apply a series of inapplicable authorities, including its own lawsuit involving a high school in California decided by that state's trial court. Despite the existence of this Court's precedent that controls this case, which SCAD brought to the District Court's attention throughout its summary judgment briefing, (*see, e.g.*, Doc. 40-1, pp. 21-22; Doc. 46, pp. 3-9; Doc. 49, pp. 2-3, 11-13), the court below inexplicably failed to even mention *University of Georgia* or *Boston Professional Hockey* in its opinion. Thus, it is not clear why the District Court did not apply this law, but it erred in failing to do so.

### B. The District Court Erred in Instead Applying Case Law Relating to Priority Disputes

In the District Court's brief analysis of the instant case, the court instead applied this Circuit's decision in *Crystal Entertainment & Filmworks, Inc. v. Jurado*, 643 F.2d 1313 (11th Cir. 2011), for its erroneous decision that SCAD cannot rely on the use of its trademarks with respect to educational services to prohibit Sportswear's activities and instead must show use of the marks in commerce *on apparel* before Sportswear's use. (Doc. 53, p. 6). *Crystal Entertainment*, however, not only does not stand for that proposition, but it also presents markedly different facts and is not applicable here.

The most significant distinction between the instant case and *Crystal*

22

*Entertainment* is that the latter involved a priority dispute, *i.e.*, a case where two parties are both using a trademark *to designate the source of their own goods or services*, and a court must determine which party has priority to the mark. *Id.* at 1320 (noting that parties sought a determination from the court regarding who owned rights to the mark at issue).[12]  Here, Sportswear has no trademark rights at issue.  Indeed, although Sportswear passive-aggressively mentioned that its use of SCAD's trademarks started in 2009, Sportswear has never actually asserted priority of use of SCAD's trademarks as to apparel and related goods—because it cannot.  Indeed, Sportswear's defense is that it is *not* using SCAD's trademarks to designate the source of its goods, *i.e.*, as a trademark (*see, e.g.*, Doc. 47, p. 28).  Thus, the flaw with the District Court's analysis is that it erroneously approaches the case as if Sportswear and SCAD were competing companies that had chosen similar brand names for the same or a similar product.[13]    The *Crystal Entertainment* opinion does not address the situation presented here, where one

---

[12] The case that the *Crystal Entertainment* opinion cited, *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188 (11th Cir. 2001), was also a priority dispute. *See id.* at 1191-92 (noting that plaintiff sought to use mark "Coolmail" for its e-mail service, while defendant sought to use mark "CoolMail" for its competing e-mail service).  And so was the case that the *Planetary Motion* Court cited, *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1020 (11th Cir. 1989)(resolving dispute between two parties both seeking to use the mark "You and the Law" in connection with competing educational programs).

[13] To demonstrate how inapposite the District Court's analysis was, Sportswear would have to engage in providing educational services for the rule noted in *Crystal Entertainment* to apply.

party does not have any trademark rights at issue, and thus its rule does not extend to the present context.[14]

*Crystal Entertainment* is also distinguishable in presenting a significantly different set of facts. Corporate ownership rights to the name of a musical group and breach of contract claims, not involved in the instant case between SCAD and Sportswear, also played a part in the case. 643 F.3d at 1321, 1318. The suit also involved a "case of joint endeavors," where multiple parties may have used a mark (again, *as a trademark*) together, and a court must determine which party controlled the nature and quality of the services performed under the mark. *Id.* at 1322-23. The Court noted that this was a type of trademark dispute—joint

---

[14] The only other case cited by the court below in resolving the trademark issues was a decision from the United States District Court for the Southern District of New York, *Gameologist Group, LLC v. Scientific Games International, Inc.*, 838 F. Supp. 2d 141 (S.D.N.Y. 2011). The District Court seemed to interpret that case as limiting SCAD to protecting its trademarks only in the context of educational services. (Doc. 53, p. 5). *Gameologist* of course cannot alter the law in this Circuit, but it also involved a priority dispute and is likewise inapt for the same reason as *Crystal Entertainment*. Indeed, the portion of the *Gameologist* opinion cited by the District Court, 838 F. Supp. 2d at 153, stands for an unremarkable proposition regarding the presumptions that attach to federal registrations when two parties seek to use the same or similar trademarks to designate their own goods or services in similar but different markets, and simply has no bearing on the issue at hand. Indeed, SCAD relies on the law set forth in *Boston Professional Hockey* and *University of Georgia* to establish its right to prohibit Sportswear's sale of apparel, rather than on the statutory presumption its federal registration affords it. Indeed, it is undisputed that SCAD owns valid registrations for the trademarks at issue with respect to educational services, *see infra* Part II.B, which is all that *Boston Professional Hockey* and *University of Georgia* require under the facts of this case; thus, the scope of the statutory presumption is entirely irrelevant here.

endeavor rights—that it had not yet addressed. *Id.* at 1322. Moreover, the plaintiff in *Crystal* Entertainment could not establish any rights to the alleged mark. For example, unlike SCAD, the plaintiff had failed numerous times to obtain federal trademark registration for the disputed mark for any goods or services. 643 F.3d at 1316-17. The Court therefore applied the typical priority rule that the plaintiff needed to show prior use of the mark in commerce. *Id.* at 1321. The *Crystal Entertainment* plaintiff attempted to rely on a purported assignment of purported trademark rights and could not prove any actual use of the mark in commerce (in connection with any goods or services). *Id.* at 1317, 1320-21. Here, SCAD has ample enforceable rights in its marks by virtue of both its common law rights and federal registrations as directed to services.[15] Lastly, the district court had found that the defendants had common law rights to the mark, *id.* at 1319, whereas, again, it is undisputed that Sportswear does not have such rights (rather it claims that its use of SCAD's trademarks does not violate any of SCAD's rights).

The District Court in this case thus failed, in contravention of the well-established precedent discussed in Part I.A, *supra*, to appreciate that SCAD's case is not dependent on when SCAD first began selling or advertising apparel with SCAD's trademarks. Indeed, SCAD does not need not to rely on common law

---

[15] And as *Boston Professional Hockey* and *University of Georgia* demonstrate, those rights are sufficient to sustain this cause of action. *See supra* Part I.A.

rights established through the use of its trademarks *in connection with the sale of apparel* to prevail in this case. The lower court thus erred in utilizing an inappropriate framework requiring SCAD to establish common law rights through prior use of its marks on apparel to analyze the case. This Court should accordingly reverse the District Court's grant of Sportswear's motion for summary judgment.

## II.    SCAD is Entitled to Summary Judgment

As discussed above, Sportswear's case is based on the legally erroneous premise that because SCAD does not hold federal registrations for apparel, Sportswear's sale of apparel does not infringe. The District Court's decision is likewise based on an analysis that is flawed as a matter of law, rather than a determination that any genuine issue of material fact under the applicable law existed with respect to SCAD's motion for summary judgment. Indeed, both parties filed cross-motions for summary judgment and this case is appropriate for resolution without trial. Because Sportswear failed to establish any genuine issue of material fact regarding the validity of SCAD's trademarks or the likelihood of confusion from Sportswear's unauthorized use of those trademarks, SCAD is entitled to summary judgment.

### A.    The Lanham Act and GUDTPA

The Lanham Act prohibits trademark infringement and false designation of

origin.  15 U.S.C. §§ 1114, 1125.  To prevail in an action for infringement of a federally registered trademark, "the plaintiff must show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion."  *Dieter v. B & H Indus., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) (citing 15 U.S.C. § 1114 (1)(a)).[16]  A claim for false designation of origin under section 43 of the Lanham Act arises when a person uses in commerce a word, term, name or symbol, or a false or misleading description or representation of fact which is likely to cause confusion or to deceive as to the origin, sponsorship or approval of goods.  15 U.S.C. § 1125 (a)(1).[17]  This cause of action is not limited to

---

[16] 15 U.S.C. § 1114 (1) provides:
> Any person who shall, without the consent of the registrant–
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

[17] 15 U.S.C. § 1125 (a) provides:
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

federal registrations. *Id.*; *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512-13 (11th Cir. 1984) (noting that "the use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a)" (internal quotations and citations omitted)). Regarding these federal causes of action, the same facts and analysis that would support an action for trademark infringement would also support an action for false designation of origin. *See, e.g.*, *Boston Prof'l Hockey*, 510 F.2d at 1010, 1008-14 (applying same analysis to affirm trademark infringement cause of action under 15 U.S.C. § 1114 for plaintiffs with registered trademarks and to reverse denial of relief under 15 U.S.C. § 1125 for plaintiff that had no federal registration and noting that both causes of action may be satisfied by the same "likelihood of confusion" test); *University of Georgia*, 756 F.2d at 1546-47 ("The *Boston Pro. Hockey* rule applies to claims under section 43(a) of the Lanham Act, as well as to claims for infringement of federally registered trademarks."); *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503-04 (11th Cir. 1985) (noting that factors relevant to establishing a false designation of

---

      (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

28

origin claim under 15 U.S.C. § 1125(a) "are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114.").

Courts analyzing Georgia's related statutes under the GUDTPA likewise employ the likelihood of confusion test for trademark infringement, false designation of origin, and unfair competition actions. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC,* 605 F.3d 931, 935 & n.16 (11th Cir. 2010); *see also Ackerman Sec. Sys., Inc. v. Design Sec. Sys., Inc.,* 201 Ga. App. 805, 806, 412 S.E.2d 588 (1991) (noting that in state law actions for trademark infringement, deceptive trade practices, and unfair competition, "[t]he appropriate legal test for these claims is the 'likelihood of confusion' test."). GUDTPA "provides a cause of action when a person, 'in the course of his business, vocation, or occupation . . . [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services.'" *Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th Cir. 1997) (citing O.C.G.A. § 10-1-372)). As the Court has noted, "It should be apparent that . . . the Lanham Act and [GUDTPA] provide analogous causes of action governed by the same standard." *Id.*; *see also Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 n.11 (11th Cir. 2007) (noting that "the analysis of a

Georgia unfair competition claim is 'co-extensive' with the analysis of a Lanham Act claim").

Thus, the analysis necessary to establish liability is the same for all three of SCAD's claims for relief.

### B.     There is No Genuine Issue of Material Fact That SCAD Owns Valid Trademarks

As the District Court noted, "the parties agree that the Plaintiff has valid registrations for the four marks at issue." (Doc. 53, p. 5; *see also* Doc. 47-3, pp. 6-7).[18]  Indeed, Sportswear does not and cannot dispute SCAD's trademark rights regarding educational services.  (*See, e.g.*, Doc. 47, pp. 6, 11).  As discussed in Part I.A, *supra*, these valid trademarks as to services are sufficient to support SCAD's claims for relief, and the District Court erred in requiring more.

The only remaining question is therefore whether Sportswear's use of SCAD's trademarks was likely to cause confusion.

### C.     There is No Genuine Issue of Material Fact That a Likelihood of Confusion Exists

There is also no genuine issue of material fact that Sportswear has used SCAD's trademarks in a manner likely to create consumer confusion.  This Court analyzes the likelihood of confusion according to seven factors: (1) type of mark

---

[18] Again, the District Court erred, however, in holding that those valid registrations to educational services were insufficient to prevent Sportswear's sale of apparel. (Doc. 53, p. 5).

alleged to have been infringed; (2) similarity of the infringed and infringing marks;

(3) similarity between the goods or services offered under the two marks; (4)

similarity of the actual sales methods used by the two parties, such as their sales

outlets and customer base; (5) similarity of advertising methods; (6) intent of the

alleged infringer to misappropriate the proprietor's good will; and (7) existence

and extent of actual confusion. *See, e.g.*, *Welding Servs., Inc. v. Forman*, 509 F.3d

1351, 1360 (11th Cir. 2007); *Dieter*, 880 F.2d at 326. Depending on the particular

facts of the case, however, some factors might be relatively "insignificant under

the circumstances," *University of Georgia*, 756 F.2d at 1542; *see also Conagra*,

743 F.2d at 1514 & n.8 (basing conclusion of likelihood confusion on less than all

seven factors), and all factors need not be addressed separately, 743 F.2d at 1514&

n.8. Indeed, in *University of Georgia,* the Court held that the "defendant's intent

and similarity of design between the two marks [was] sufficient to support the

district court's finding on a 'likelihood of confusion[.]'" 756 F.2d at 1545.

### 1.    SCAD's Trademarks Are Strong and Distinctive

The first likelihood of confusion factor, regarding the "type" of mark, refers

to the four-part classification system used to assess a trademark's strength and

validity. This Court classifies marks into four levels of distinctiveness (and

strength), ranging from least to most distinctive: (1) generic; (2) descriptive; (3)

suggestive; and (4) arbitrary or fanciful. *Investacorp, Inc. v. Arabian Inv. Banking*

*Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991). "The more distinctive a plaintiff's [mark], the greater the likelihood that consumers will associate the registered mark and all similar marks with the registered owner. The law therefore provides greatest protection to strong and distinctive [marks]." *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir. 1985).

As they are incontestable, SCAD's marks to SAVANNAH COLLEGE OF ART AND DESIGN, SCAD, and the SAVANNAH COLLEGE OF ART AND DESIGN shield design mark weigh particularly in SCAD's favor in analyzing this factor. Incontestable marks are "relatively strong." *Dieter*, 880 F.2d at 329; *see also Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1336 (11th Cir. 1999) (holding that mark's incontestability serves to enhance its strength).

SCAD's considerable efforts in protecting and using its trademarks further enhance the strength of its marks. The more that a mark has been promoted and the longer that it has been in use, the stronger the mark is likely to be. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982). SCAD has made significant monetary expenditures, utilizing a variety of media to promote its marks (*see, e.g.*, Doc. 39-22, p. 9; Doc. 46-1, pp. 9-10), and it has used its marks for a lengthy period of time, (Doc. 47-3, pp. 4-6; Doc. 40-3, p. 2; Doc. 1-1; Doc. 1-2; Doc. 1-3). In addition, SCAD has carefully controlled how

its marks are used.  (Doc. 40-3, p. 4; Doc. 46-2, p. 3; Doc. 47-3, p. 10; Doc. 49-1, p. 12).

Lastly, for SCAD's marks (or portions of marks) that could have initially been considered originally descriptive, namely "SAVANNAH COLLEGE OF ART AND DESIGN," SCAD established acquired distinctiveness to achieve registration (Doc. 46-1, pp. 8-10) and, again, two of such registrations containing "SAVANNAH COLLEGE OF ART AND DESIGN" are incontestable.  The SCAD word mark is at least a suggestive mark and perhaps arbitrary, as no showing of secondary meaning was required for its registration.  Accordingly SCAD has strong marks that should be given deference and protection, and this factor weighs in SCAD's favor.

### 2.    The Similarity of Marks Strongly Favors SCAD

Sportswear cannot dispute the similarity of SCAD's marks and the marks on Sportswear's products.  Indeed, the entire point of Sportswear's business is to use the trademarks of other institutions identically, making them available on its website for customers to buy from Sportswear – it offers no goods with its own trademarks, it only sells goods with the trademarks of others.

The more similar the marks, the more likely they will be confused.  *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc.,* 756 F.2d 1525, 1531 (11th Cir. 1985).    Most of Sportswear's products at issue in this case involve exact

33

reproduction of SCAD's trademarks, (*see, e.g.*, Doc. 47-3, p. 14; Doc. 40-4, pp. 4, 15, 18, 26, 50, 62), and thus this factor strongly favors SCAD.

Even for Sportswear's uses that do not involve exact identical reproduction of SCAD's trademarks (*see, e.g.*, Doc. 40-10, p. 5 (using just the bee portion of SCAD's trademark)), this factor still favors SCAD.  Courts look to the overall similarity of the infringed and infringing marks in assessing the likelihood of confusion.  *See University of Georgia,* 756 F.2d at 1544 ("[I]t is the combination of similar . . . elements, rather than any individual element, that compels the conclusion that the two [marks] are similar."); *see also Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir. 1989) ("Similarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." (citations and quotations omitted)); *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,* 550 F.3d 465, 480-82 (5th Cir. 2008) (finding infringement where defendant's shirt clearly referred to LSU, without containing the initials "LSU").  This Court thus analyzes the marks as composite wholes, not isolated parts, and looks for overall similarity, and identicality (although it exists here for some of SCAD's marks) is *not* required.[19]

---

[19] As the *Boston Athletic* court noted, "few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." 867 F.2d at 30.

The illustrated bee is a prominent part of SCAD's trademark featured on Sportswear's products and renders them similar overall. Here of course, there is exact duplication of SCAD marks in addition to the non-exact uses, and this factor accordingly strongly favors SCAD.

### 3. The Products, Customers, and Advertising, to the Extent Relevant, Are Similar If Not the Same

In *University of Georgia*, the Court noted that these three factors were less significant than in most trade or service mark cases because "the confusion stems not from the defendant's unfair competition with the plaintiff's *products*, but from the defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark." 756 F.2d at 1547. Nevertheless, to the extent relevant, and because SCAD does sell apparel, these factors favor SCAD. Specifically, Sportswear's "Savannah College of Art and Design Bees Apparel Store" offered many products that were the same or substantially similar to the products offered by SCAD. (Doc. 40-4, pp. 10-14). SCAD and Sportswear also overlap in selling products through online outlets, and their customers and methods of reaching them are co-extensive, namely people interested in apparel bearing SCAD marks. Further, these customers interested in SCAD apparel would be able find goods produced by both Sportswear and SCAD's authorized retailer through the same marketing channels, such as an internet search. Thus, these three factors regarding

competitive proximity favor SCAD.

The use of any disclaimers on Sportswear's website or in its advertising that its products are not authorized by SCAD, (*see, e.g.*, Doc. 40-10, p. 13 (noting in small letters, "This store is not sponsored or endorsed by Savannah College of Art and Design")), does not eliminate the likelihood of confusion. Indeed, in *Boston Professional Hockey*, the Court held that a disclaimer that the products were not authorized by or originating with the plaintiffs, which had been required and approved by the district court, was insufficient as a matter of law to excuse the defendant's conduct. *Boston Prof'l Hockey*, 510 F.2d at 1008; *id.* at 1013 ("[W]ords which indicate [the defendant's use] was not authorized by the trademark owner are insufficient to remedy the illegal confusion. Only a prohibition of the unauthorized use will sufficiently remedy the wrong."). The disclaimer "'Not associated with the University of Georgia' (in small silver print)" was also insufficient in *University of Georgia*. 756 F.2d at 1537, 1547 (rejecting defendant's argument that no confusion could result due to presence of a disclaimer).

These factors accordingly support SCAD's case.

### 4.    Sportswear's Intent Is a Critical Factor in SCAD's Favor

This factor carries particular weight in the likelihood of confusion analysis, *see, e.g., University of Georgia*, 756 F.2d at 1545 (holding "defendant's intent and

the similarity of design between the two marks sufficient to support the district court's finding of a 'likelihood of confusion'"); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (noting defendant's intent was a "critical factor"), and it strongly favors SCAD. Indeed, when a "mark was adopted with the intent of deriving benefit from the reputation of [the mark holder]," as is the case here, "that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *Amstar*, 615 F.2d at 263 (quoting Restatement of Torts § 729, cmt. f (1938)).

As with the defendant in *University of Georgia*, Sportswear's intent is clear. *See University of Georgia*, 756 F.2d at 1545 ("The defendant's intent likewise is apparent from the record. . . . [The defendant's beer] was *intended to capitalize on the popularity of the University of Georgia football program*." (emphasis added)). Sportswear's products purposefully use SCAD's trademarks. Sportswear intends to create in the mind of the consumer an association with SCAD, based on the excellent reputation SCAD has developed—without which Sportswear's SCAD products would be worthless—and to opportunistically capitalize on it for Sportswear's gain. This factor thus strongly favors SCAD.

### 5. Sportswear Misunderstands What Constitutes Actionable Confusion under the Lanham Act

The final factor of the infringement analysis also weighs in SCAD's favor.

Although actual confusion is not required to prove a likelihood of confusion, *see supra* Part II.C (providing authorities explaining that not all likelihood of confusion factors are necessary); *see also Rolls Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F. Supp. 689, 694 (N.D. Ga. 1976) (noting that "confusion need not always be that of a potential purchaser"), SCAD has brought forth evidence showing actual confusion regarding whether Sportswear's products are sponsored by SCAD.  The evidence, uncontroverted by Sportswear, shows that even SCAD employees, who undoubtedly would have an interest in purchasing SCAD items, had to inquire as to whether Sportswear's sale of SCAD merchandise was allowed or authorized.  (Doc. 45-11).  This is the same type of evidence before the Court in *University of Georgia* that supported the conclusion that a likelihood of confusion existed.  *See University of Georgia*, 756 F.3d at 1546, 1547 (noting that University of Georgia professor had received inquiries about the connection between "Battlin' Bulldog Beer" and the University of Georgia).

Sportswear's position on this issue underscores the fundamental flaw in its case.  According to Sportswear, "confusion must be as to the origin or source of the physical goods, not merely confusion as to the origin of the trademarks."  (Doc. 47, p. 6).  As discussed in Part I.A, *supra*, this Court's precedent is *directly to the contrary*.  Indeed, the Court has foreclosed Sportswear's argument as a matter of law, holding: "The argument that confusion must be as to the source of the

manufacture of the [product] itself is unpersuasive, where the trademark, originated by the [mark holder], is the triggering mechanism for the sale of the [product]." *Boston Prof'l Hockey*, 510 F.2d at 1012; *see also id.* at 1010 ("A broadening of the protection afforded by the statute [§ 1114] occurred by amendment in 1962 *which deleted the previously existing requirement that the confusion or deception must relate to the 'source of origin of such goods or service*.'" (emphasis added)).   As the *University of Georgia* Court explained, "'Confusion' need not relate to the origin of the challenged *product*.  Rather confusion may relate to the public's knowledge that the *trademark*, which is 'the triggering mechanism' for the sale of the product, originates with the plaintiff." 756 F.2d at 1546 (emphasis in original); *see also* R. Schechter & J. Thomas, *Intellectual Property: The Law of Copyrights, Patents and Trademarks* 638 (2003) ("A second basic principle of trademark infringement law is that the plaintiff is entitled to relief if it can show likely confusion either as to the source of the goods, or as to their sponsorship."  (emphasis added)).   Moreover, "[u]nder section 1114(1) of the Lanham Act, the likely to confuse test is satisfied when potential purchasers of the trademark holder's products would be likely to be confused should they encounter the allegedly counterfeit goods in a post-sale context[.]" *United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987) (citing, *inter alia*, *Boston Prof'l Hockey*, 510 F.2d at 1012)).  In sum, the weakness underlying

39

Sportswear's entire position is that it fails to take into account the scope of confusion that is actionable under the Lanham Act.  That error compels a resolution in SCAD's favor not only as to this factor, but as to the entire case.

## III.    The District Court Erred by Granting in Part Sportswear's Motion to Strike

Under the proper law applicable to SCAD's claims for relief, the evidence excluded by the District Court is irrelevant to the resolution of this case, as discussed in Part I, *supra*.  In the event that this Court, however, applies the same or a similar legal standard as the District Court, the District Court committed reversible error in excluding the article cited in SCAD's reply brief in support of its motion for summary judgment.  (Doc. 49, p. 2 n.1).  Indeed, the District Court applied incorrect legal standards in resolving Sportswear's motion, and thus its ruling should be reversed, even under the abuse of discretion standard.  *See SunAmerica Corp. v. Sun Life Assurance Co.*, 77 F.3d 1325, 1333 (11th Cir. 1996) (noting that district court abuses its discretion if it applies an incorrect legal standard).

The District Court first applied an incorrect legal standard in relying on this Court's decision in *United States v. Oakley*, 744 F.2d 1553 (11th Cir. 1984).  That case relates to a well-settled principle of appellate practice regarding the ability of a court *on appeal* to entertain issues raised for the first time in a reply brief—a

very different context from a trial court ruling on summary judgment.  *See id.* at 1556 ("Arguments raised for the first time in a reply brief are not properly before the *reviewing court*." (emphasis added)).  Indeed, SCAD was properly responding, in its summary judgment reply brief, to Sportswear's emphasis in its opposition to SCAD's motion for summary judgment that Sportswear began selling SCAD apparel in 2009 and that SCAD "could have offered these clothes in 2015."  (Doc. 47, p. 20).

The District Court further applied an incorrect legal standard in excluding the article because SCAD was not required to produce it.  Federal Rule of Civil Procedure 37 permits a district court to exclude evidence when a party has failed to properly respond to a discovery request.  Fed. R. Civ. P. 37(c)(1).  A party, however, is only required to produce items in its "possession, custody, or control." *See* Fed. R. Civ. P. 34 (permitting requests to produce "items in the responding party's possession, custody, or control"); *see also* Fed. R. Civ. P. 26 (requiring initial disclosures regarding "documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control"). SCAD even properly emphasized its rights according to that rule in responding to Sportswear's discovery requests.  (Doc. 39-24, p. 2; Doc. 39-23, p. 1 (objecting to Sportswear's discovery requests outside the scope of the Federal Rules of Civil Procedure or that purport to require the production of "information or documents

41

outside of Plaintiff's possession, custody, or control")).  The article at issue here appeared on a publicly available source located by SCAD's attorneys after receiving Sportswear's brief in opposition to SCAD's motion for summary judgment, while preparing SCAD's summary judgment reply brief.  (Doc. 51-1, p. 3).  Sportswear could conduct the same or a similar search of the internet to locate information about SCAD's sale of apparel.  At a minimum, however, neither SCAD nor its attorneys knew of the article during discovery, and thus it was not a document or thing within SCAD's possession, custody, or control and therefore not within the scope of the Federal Rules of Civil Procedure.[20]  As a result, Rule 26 has not been violated and the District Court had no grounds to exclude the article.

In addition, the article, relating to SCAD's use of its trademarks in connection with the sale of apparel before 2009, was outside the scope of Sportswear's discovery requests and did not contradict SCAD's previous discovery admissions.[21]  The District Court accordingly erred in penalizing SCAD on this

---

[20] Even assuming *arguendo* that SCAD was obligated to produce the evidence at issue, SCAD was "substantially justified" under Federal Rule of Civil Procedure 37(c)(1) in not producing the article for the same reasons noted above.  SCAD is further substantially justified in relying on the article because SCAD did so in response to Sportswear's emphasis in its brief in opposition to SCAD's motion for summary judgment that Sportswear began selling apparel in 2009.

[21] For at least this same reason, the District Court was correct in denying Sportswear's motion as to the Flower declaration, although the court did so on the basis that it was moot, rather than on the merits.  The Flower declaration is focused only on the expenditures and methods used "to promote SCAD and *its services and*

basis as well.  Sportswear's requests, and the truthful discovery responses provided by SCAD, were directed to the *first use* of SCAD's trademarks on apparel.  (*See, e.g.*, 39-23, pp. 3, 8-10; Doc. 39-24, pp. 3, 4-6; Doc. 39-6, p. 15; Doc. 39-21, pp. 17, 21).  In contrast, the article only shows, to the extent necessary to respond to Sportswear's brief in opposition to SCAD's motion for summary judgment, that SCAD had used its marks on apparel before Sportswear's use in 2009—an unsurprising fact given that SCAD was founded in 1978.  It does not establish, or seek to establish, SCAD's *first use* of its trademarks in connection with the sale of apparel.  As a result, Sportswear cannot meet the high bar required to apply the principle of estoppel mentioned by the District Court.  *See, e.g.*, *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1182 (11th Cir. 2013) (noting, among other factors relevant to application of judicial estoppel, existence of "a clear inconsistency between the earlier position and the later position").

---

*programs*" (Doc. 49-2, pp. 2-3 (emphasis added)) rather than expenditures *on apparel* and was therefore likewise outside the scope of Sportswear's discovery requests and did not contradict SCAD's previous admissions.  In addition, the declaration was submitted in support of SCAD's Response to Sportswear's Statement of Additional Material Facts, which Sportswear had submitted in opposition to SCAD's motion for summary judgment.  (Doc. 49-1, pp. 9-10).  SCAD's response was submitted in conjunction with its reply brief, which was the first, and the appropriate, time to submit this evidence.  Thus, in the event that this Court remands this case for additional proceedings on the merits, SCAD should also be permitted to rely on the Flower declaration.

Lastly, the District Court's decision had a substantial prejudicial effect on SCAD. This Court reviews "a district court's ruling on the admissibility of evidence for abuse of discretion, and evidentiary rulings will be overturned only if the moving party establishes that the ruling resulted in a 'substantial prejudicial effect.'" *Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999). Here, a substantial prejudicial effect exists. If admitted, the article cited by SCAD would, at a minimum, establish a genuine issue of material fact under the District Court's analysis of the case such that Sportswear's motion for summary judgment should be denied, if not conclusively establish that SCAD is entitled to summary judgment. Thus, if this Court does not agree that SCAD is entitled to summary judgment and remands this case for further proceedings, SCAD should be permitted to rely on the article and declaration that were the subject of Sportswear's motion to strike.

## CONCLUSION

For the reasons stated, this Court should reverse the District Court's grant of Sportswear's motion for summary judgment, reverse the District Court's denial of SCAD's motion for summary judgment, and remand the case for further proceedings.

This 5th day of October, 2015.

/s/ W. Scott Creasman
W. Scott Creasman
Kelly Casey Mullally
Seth K. Trimble
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
(770) 434-6868
screasman@taylorenglish.com

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in plain, roman style 14-point Times New Roman.

*/s/ W. Scott Creasman*
W. Scott Creasman
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
(770) 434-6868
screasman@taylorenglish.com

*Attorney for Plaintiff-Appellant*

Dated:  October 5, 2015

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Brief of Plaintiff-Appellant Savannah College of Art and Design, Inc., by ECF filing and by causing a true copy to be deposited in the U.S. Mail, proper postage prepaid addressed to all the parties as follows:

> Bradford J. Axel
> Leslie C. Ruiter
> STOKES LAWRENCE, P.S.
> 1420 Fifth Avenue Suite 3000
> Seattle, Washington 98101-2393
>
> *Attorneys for Defendant-Appellee*

This 5th day of October, 2015.

> */s/ W. Scott Creasman*
> W. Scott Creasman
> TAYLOR ENGLISH DUMA LLP
> 1600 Parkwood Circle, Suite 400
> Atlanta, Georgia 30339
> (770) 434-6868
> screasman@taylorenglish.com
>
> *Attorney for Plaintiff-Appellant*

CS-1